# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

### MONROE DIVISION

BRYAN KEITH STANLEY, aka TIM FOWLER          CIVIL ACTION NO. 09-0863

VS.                                                                            SECTION P

OUACHITA CORRECTIONAL CENTER, ET AL.      CHIEF JUDGE JAMES

                                                                                   MAGISTRATE JUDGE HAYES

## SUPPLEMENTAL REPORT AND RECOMMENDATION

*Pro se* plaintiff Bryan Keith Stanley filed a civil rights complaint pursuant to 42 U.S.C. §1983 on May 22, 2009, complaining of unsafe conditions of confinement, the prison's failure to protect him from violence by other inmates, and inadequate medical care. [Doc. 1] On July 28, 2009, the undersigned recommended dismissal of all of plaintiff's claims as frivolous. [Doc. 8] On August 10, 2009 plaintiff objected to the Report and Recommendation. [Doc. 9]

On September 14, 2009 the Court adopted the report insofar as it recommended dismissal of plaintiff's conditions of confinement and failure to protect claims as frivolous.  However, based on plaintiff's objection, the Court remanded the medical care claim for further proceedings and directed the undersigned  to issue a supplemental Report and Recommendation, noting, "Although Stanley previously alleged that he was injured as a result of a slip and fall at the OCC, he alleges for the first time in his Objection that he broke his neck when he fell... Based on Stanley's new factual allegations, the Court declines to adopt the portion of the Report and Recommendation analyzing Stanley's claim of inadequate medical care..." [Docs. 10. 11]

On September 21, 2009, the undersigned directed. plaintiff to amend his medical care

complaint and to provide the answers to specific questions. Doc. 12][1]

On the same date, plaintiff notified the Court that he was, as of that date, residing at what appears to be a residential address in Clinton, Mississippi. [Doc. 13] The amend order, which had been sent to plaintiff along with the Court's Ruling and Judgment was returned to the Clerk of Court since plaintiff was no longer in custody at the OCC. [Docs. 14-16] The Clerk  then sent copies of the Court's Ruling and Judgment [Docs. 10-11] and the Memorandum Order directing plaintiff to amend his complaint [Doc. 12] to plaintiff's new address in Mississippi.

On October 19, 2009, plaintiff alleged that his repeated efforts to obtain medical records from OCC and LSU Medical Center were unfruitful. He then alleged that he "... has been waiting for a ruling from the Fourth J.D. Court ordering both L.S.U. Medical Center and Ouachita Correctional Center to provide all Medical records in regards to Civil Case No. 3:09-0863." Plaintiff then requested this Court to order OCC and LSU Medical Center to provide the medical records. [Doc. 17]

On October 26, 2009, plaintiff filed an amended complaint and supporting memorandum of law. The amended complaint consists of 14 pages and 50 numbered paragraphs. Plaintiff

---

[1] Plaintiff was directed to provide: 1. Specific factual allegations stating the following: (A)  the name(s) of each person  who allegedly violated plaintiff's constitutional rights; (B)  a description of what actually occurred or what each defendant did to violate plaintiff's rights;   (C)  the place and date(s) that each event occurred; and (D)  a description of the alleged injury sustained as a result of the alleged violation. 2. Plaintiff should also  provide: (A)  The date upon which the December 10, 2008 x-rays were examined by the E.A. Conway specialist.(B) The name of the specialist; (C) The exact diagnosis made by this specialist; (D) The treatment ordered by this specialist or any other physician following the ultimate diagnosis; (E) Plaintiff should state the dates upon which he was examined or treated by any Health Care Professionals between December 10, 2008 and the present and  he should describe in detail the treatment he received;(F) For the same time period plaintiff should state  whether any diagnostic tests were performed, the results of those tests, and whether the physician or health care professional ordered any particular or specific  form of therapy or treatment. (G) To the extent that a particular medication or treatment was ordered by any physician treating plaintiff for the injuries he sustained plaintiff should state whether or not he has been denied the treatment or medication, who was responsible for denying the treatment or medication, and the dates that he was denied the treatment or medication and the reason given, if any, to justify the denial of the specific treatment or medication.[Doc. 12 (Emphasis in original)]

2

provided additional argument in support of the conditions of confinement and failure to protect claims and little additional information in support of his medical care claim.  [Doc. 20] His Incorporated Memorandum likewise addressed the claims which were previously dismissed and devoted only a few paragraphs to the medical care claims. Neither the amended complaint nor the supporting memorandum addressed the issues plaintiff was ordered to address in the memorandum order.

On November 23, 2009, plaintiff filed a Motion asking the Court to "suspend fees and costs" and to appoint counsel to represent him. In that motion plaintiff confirmed that he was no longer incarcerated and was residing with his mother at a residential address in Mississippi. [Doc. 23]

### Plaintiff's Allegations of Fact

Plaintiff has filed an original complaint [Doc. 1], Objections to the original Report and Recommendation [Doc. 9], an Amended Complaint [Doc. 20], and a Supplemental Petition. [Doc. 22] The undersigned has again reviewed each pleading.

### 1. Original Complaint [Doc. 1]

With regard to the remaining medical care claim, plaintiff made the following claims in his original complaint:

1. On December 10, 2008 plaintiff slipped and fell and injured himself. [Doc. 1, ¶8] When prison authorities were alerted to plaintiff's accident, they transported him to LSU Medical Center/E.A. Conway Hospital in Monroe. An x-ray examination was performed but since "... they had no medical personell [sic] able and qualified to read the (neck) x-rays... plaintiff was diagnosed with multiple contusions... and ... was prescribed nothing for his 'severe pain.'" [Doc. 1, ¶10]

3

2. Plaintiff continued to complain of pain upon his return to OCC but the medical staff advised him to purchase over the counter pain medication, like Tylenol, from the OCC commissary. [Doc. 1, ¶11]

3. Plaintiff continued to complain of severe pain and despite "...begging Deputys [sic] and OCC Medical Staff for help they refused to do anything..." Plaintiff's repeated requests to be brought to another hospital or doctor were ignored. [Doc. 1, ¶12 and 15]

4. A month following his accident – or sometime in January, 2009, the x-rays were read by a specialist who apparently diagnosed the fracture that plaintiff now complains about. Plaintiff was then returned to the hospital for an unspecified period of time and then returned to Dorm 201 where he was assaulted by two other inmates. [Doc. 1, ¶18-20]

5. Plaintiff continued to complain of pain and, on March 4, 2009, he was advised that OCC was awaiting orders from the physician at E.A. Conway Hospital. In May 2009 he was advised that an appointment with an orthopedic physician had been made at the LSU Medical Center and that until that time he would continue to be treated at LSU-Monroe, a State hospital. [Doc. 1, ¶22, see also pp. 14-16]

## *2. Report and Recommendation [Doc. 8] and Objections [Doc. 9]*

Based on the foregoing allegations, the undersigned made the following observations:

1. At the times relevant to his complaint, plaintiff was a pre-trial detainee.

2. His medical care claim thus arose under the due process clause of the Fourteenth Amendment, and, in order to prevail, plaintiff was required to show deliberate indifference on the part of each defendant named in his complaint.

3. The undersigned then concluded that plaintiff was not entitled to relief on his medical care claim because – "... plaintiff received immediate medical attention once prison officials

were made aware of his accident. Plaintiff was taken to a nearby hospital where he was examined by physicians who determined that he had suffered from nothing more serious than contusions. The treatment recommended for plaintiff's condition was appropriate under the circumstances. ... Plaintiff, however, merely disagrees with the diagnosis and treatment; such disagreement is insufficient to state a claim for deliberate indifference." [Doc. 8, pp. 11-12]

On August 10, 2009, plaintiff objected to the Report and Recommendation and, for the first time, alleged that he sustained a "broke neck and/or fractured neck" as a result of the slip and fall at the prison. [Doc. 9, p. 2] More specifically:

1. He complained that "... L.S.U.  Medical Center sent plaintiff back to jail with a broke neck/fractured neck and failed to properly diagnose plaintiff until a month later, subjecting plaintiff to the unnecessary mistreatment and allowing plaintiff to rely on over the counter meds that no normal person would expect relief would come from over the counter meds." [Doc. 9, p. 3]

2. He further alleged "... that over the counter meds and the fact that plaintiff has an orthopedic doctor appointment coming up, did nothing to reduce his pain or give plaintiff any relief whatsoever..." [Doc. 9, p. 4]

3. He alleged "... there was an overwhelming statement made that concerned the fact that there were different diagnosis between LSU Hospital and 3 weeks later x-ray doctor/analyst. In plaintiff's complaint is it clear that the reason the LSU Medical Center was named as a defendant is because there was no one available at LSU Medical/Conway to even read an x-ray and it wasn't until after that x-ray reading that the fractured neck became an issue, which establishes there had to have been two different diagnostics...  it would reveal that the medical examiner knew of the fracture and failed to warn which would cause medical malpractice in its worse

5

form..." [Doc. 9, p. 5]

4. Plaintiff then objected again noting, "... it is a complete deliberate unethical malpractice for any medical personal to make such an incriminating diagnosis [i.e. contusions] before that person even had the results of the x-rays in the first place. that mistake cost plaintiff severe pain, grief, and agony. This action/inaction in which the hospital personnel made a bad guess as to what was medically wrong with plaintiff was a complete violation of plaintiff's due process rights, adequate medical care, etc..." [Doc. 9, pp.  5-6]

5. Finally,  plaintiff alleged that the "[d]efendants named in this civil complaint violated state medical malpractice laws. They also denied access to treatment needed in the case of emergency." [Doc. 9 , p. 8]

Based on the foregoing, and specifically, plaintiff's newly advanced factual allegation – that he sustained a "...broke or fractured neck..." – the Court directed the undersigned to supplement the record and issue a Supplemental Report and Recommendation. [Docs. 10-11] As noted above, plaintiff was directed to amend his complaint and to provide the answers to specific questions of fact –

(A) The date upon which the December 10, 2008 x-rays were examined by the E.A. Conway specialist.

(B) The name of the specialist;

(C) The exact diagnosis made by this specialist;

(D) The treatment ordered by this specialist or any other physician following the ultimate diagnosis;

(E) Plaintiff should state the dates upon which he was examined or treated by any Health Care Professionals between December 10, 2008 and the present and  he should describe in detail the treatment he received;

(F) For the same time period plaintiff should state  whether any diagnostic tests

6

were performed, the results of those tests, and whether the physician or health care professional ordered any particular or specific  form of therapy or treatment.

(G) To the extent that a particular medication or treatment was ordered by any physician treating plaintiff for the injuries he sustained plaintiff should state whether or not he has been denied the treatment or medication, who was responsible for denying the treatment or medication, and the dates that he was denied the treatment or medication and the reason given, if any, to justify the denial of the specific treatment or medication. [Doc. 12 (Emphasis in original)]

### 3. Amended Complaint [Doc. 20]

On October 26, 2009, plaintiff amended his complaint; however, he failed to address <u>any</u> of the issues he was directed to address in the Memorandum Order. Instead,  and with respect to his medical care claims, he again  alleged as follows:

1. After plaintiff slipped and fell, he "... was taken to the medical office where he was examined and taken to L.S.U. Medical Center/Conway Hospital in Monroe, La. where he was again evaluated and x-rayed." [Doc. 20, ¶13][2]

2. Plaintiff was advised "... that there was no one available at L.S.U. hospital that knew how to read the x-rays..." and therefore plaintiff was returned to custody "... with <u>little or no pain relief or relievers</u>..."  [Doc. 20, ¶14][3]

3. Upon his return to jail, <u>he was not provided "... any medication by OCC and LSU to relieve the pain [he] suffered</u>." [Doc. 20, ¶ 15]

---

[2] In his memorandum plaintiff alleged, "Plaintiff called for help and was taken to the OCC infirmary and evaluated by OCC staff and taken to LSU Medical Center, but not before plaintiff had to practically beg to be taken to the hospital. [Doc. 20, ¶N]

[3] In his memorandum plaintiff alleged, that "... LSU Doctors claimed that plaintiff was alright and that he would receive nothing but over the counter and referal. [sic]" [Doc. 20, ¶O]

4. <u>Plaintiff was given Elavil[4] to help him sleep</u>, but this medication "... did nothing for pain except caused [him] to continue to hurt himself as he slept in pain and tossing and turning." [Doc. 20, ¶19; ¶V]

5. <u>The defendants "... never attempted to provide any relief other than stating to plaintiff to buy over the counter medications sold on the prison commissary. The only meds that were prescribed for plaintiff were Elavil which [did] nothing but put the plaintiff to sleep, Ultram[5] which was upsetting plaintiff's stomach and offering no relief for the pain...</u>"  [Doc. 20, ¶30]

6. <u>Plaintiff was also prescribed ranitidine[6] for stomach problems and "nurotin"[7], but "... all of these medications offered any relief for pain</u>." [Doc. 20, ¶31]

7. According to plaintiff, while he was being examined at the LSU Medical Center following his slip and fall he "... questioned ... staff as to why [there] was no one to read the x-

---

[4] Elavil or amitriptyline is a drug ordinarily used to treat symptoms of depression. <u>Medline Plus, Drugs & Supplements</u>, A Service of the U.S. National Library of Medicine and the National Institutes of Health. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682388.html#why

It is also used in some instances for the treatment of chronic pain and as a sleep aid.   <u>Encyclopedia of Mental Disorders</u>, http://www.minddisorders.com/A-Br/Amitriptyline.html

[5] Ultram or tramadol is used to relieve moderate to moderately severe pain. Tramadol is in a class of medications called opiate agonists. It works by changing the way the body senses pain. <u>Medline Plus, Drugs & Supplements</u>, A Service of the U.S. National Library of Medicine and the National Institutes of Health. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a695011.html

[6] Ranitidine is used to treat ulcers; gastroesophageal reflux disease (GERD), a condition in which backward flow of acid from the stomach causes heartburn and injury of the food pipe (esophagus); and conditions where the stomach produces too much acid, such as Zollinger-Ellison syndrome. Over-the-counter ranitidine is used to prevent and treat symptoms of heartburn associated with acid indigestion and sour stomach. Ranitidine is in a class of medications called H2 blockers. It decreases the amount of acid made in the stomach. <u>Medline Plus, Drugs & Supplements</u>, A Service of the U.S. National Library of Medicine and the National Institutes of Health. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601106.html

[7] Plaintiff probably means neurontin or gabapentin a medication developed to be used to help control seizures. <u>Medline Plus, Drugs & Supplements</u>, A Service of the U.S. National Library of Medicine and the National Institutes of Health However, it is also used to treat and control chronic pain. <u>Web MD, Pain Management Health Center</u>, http://www.webmd.com/pain-management/tc/chronic-pain-medications; see also MayClinic.com, "Chronic pain: When no physical cause can be found..." at http://www.mayoclinic.com/health/chronic-pain/PN00034

rays taken 12-11-08 of plaintiff Stanley's neck and back injuries." They advised that "... the person to read x-rays was out and possibly in another country." [[Doc. 20, ¶32; ¶P]

8. The physician who did examine plaintiff following the accident advised plaintiff that there was nothing wrong with his neck or back and that plaintiff needed to return to jail, "with no further opinions by LSU medical staff." [Doc. 20, ¶33] Plaintiff also alleged that the LSU physicians advised plaintiff that he "... only had contusions and nothing more..." [Doc. 20, ¶Q] According to plaintiff, this was "... a very bad guess as to the extent of the neck and back injury ..." [Doc. 20, Memo, p. 23, ¶7]

9. Plaintiff complained of pain to OCC medical staff who advised, "... no relief needed other than bought out of inmate commissary ... aspirin, tylenol..."  Plaintiff did as directed but these medications provided no relief. [Doc. 20, ¶34]

10. On January 10, 2009, plaintiff was advised that his x-rays were evaluated by the LSU Medical Center and it was concluded that he was suffering from a "broke neck." Plaintiff returned to the LSU Medical Center and advised that he could not be prescribed narcotic pain relievers because he was an inmate at the OCC. [Doc. 20, ¶35-36; ¶S]

11. Plaintiff's continued cry for relief "... was never provided by the OCC Medical Staff and/or LSU Medical Center hospital doctors or nurses." [Doc. 20, ¶37]

12. According to plaintiff, "... it was only a few times that OCC actually responded and acted upon [plaintiff's] numerous requests for relief in the form of treatment and/or prescriptions failing still to grant plaintiff at least some relief for the severe pain he suffered then and now..." [Doc. 20, ¶39] Plaintiff further conceded that he was provided large doses of ibuprofen, aspirin and ultram. [Doc. 20, p. 26, ¶120]

13. Plaintiff is now being cared for by his mother and treated by "medical physicians

outside of prison ... seeking relief from pain and suffering..." [doc. 20, ¶W] <u>According to</u>

<u>plaintiff, notwithstanding the care he is now receiving, he "... is still in great pain ... and still</u>

<u>remains in great pain as of ... October 13, 2009..."</u> [Doc. 20, p. 24, ¶13]

### *Law and Analysis*

#### *1. Screening*

As previously noted, when a prisoner[8] sues an officer or employee of a governmental

entity pursuant to 42 U.S.C. §1983,  the court is obliged to evaluate the complaint and dismiss it

without service of process, if it is frivolous, malicious, fails to state a claim upon which relief can

be granted, or seeks monetary relief from a defendant who is immune from such relief. 28

U.S.C.1915A; 28 U.S.C.1915(e)(2).  *Ali v. Higgs*, 892 F.2d 438, 440 (5th Cir.1990).

A claim is frivolous if it lacks an arguable basis in law or in fact, *Booker v. Koonce*, 2

F.3d 114, 115 (5th Cir.1993); see, *Denton v. Hernandez*, 504 U.S. 25, 112 S.Ct. 1728, 1733, 118

L.Ed.2d 340 (1992). A civil rights complaint fails to state a claim upon which relief can be

granted if  it appears that no relief could be granted under any set of facts that could be proven

consistent with the allegations of the complaint. Of course, in making this determination, the

court must assume that all of the plaintiff's factual allegations are true. *Bradley v. Puckett*, 157

F.3d 1022, 1025 (5th Cir.1998).

A hearing need not be conducted for every *pro se* complaint. *Wilson v. Barrientos*, 926

F.2d 480, 483 n. 4 (5th Cir.1991). A district court may dismiss a prisoner's civil rights complaint

as frivolous based upon the complaint and exhibits  alone. *Green v. McKaskle*, 788 F.2d 1116,

---

[8] Plaintiff was a "prisoner" when his cause of action arose and when he filed this complaint. See
§1915(h)("As used in this section, the term 'prisoner' means any person incarcerated or detained in any facility who
is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and
conditions of parole, probation, pretrial release, or diversionary program.")

1120 (5th Cir.1986).  District courts must construe *in forma pauperis* complaints liberally, but they are given broad discretion in determining when such complaints are frivolous.  *Macias v. Raul A. (Unknown) Badge No. 153*, 23 F.3d 94, 97 (5th Cir.1994).

A civil rights plaintiff must support his claims with specific facts demonstrating a constitutional deprivation and may not simply rely on conclusory allegations. *Schultea v. Wood*, 47 F.3d 1427, 1433 (5th Cir.1995). Nevertheless, a district court is bound by the allegations in a plaintiff's complaint and is "not free to speculate that the plaintiff 'might' be able to state a claim if given yet another opportunity to add more facts to the complaint." *Macias v. Raul A. (Unknown) Badge No. 153*, 23 F.3d at 97.

Plaintiff's complaint, objection, amended complaint and memorandum recite the facts relied upon to support his specific theory of liability with respect to his medical care claim. Plaintiff has been afforded the opportunity to provide additional information and, notwithstanding specific instructions, he has continued to allege basically the same factual allegations throughout the course of these proceedings.  Further amendment of these pleadings would serve no useful purpose since plaintiff has stated his best case with respect to his medical care claim.

### 2. Medical Care Claim

Plaintiff was a pretrial detainee when his claim arose. The constitutional rights of  pretrial detainees to adequate medical care arise from the due process guarantees of the Fourteenth Amendment. *Wagner v. Bay City*, 227 F.3d 316, 324 (5th Cir.2000); *Collins v. Ainsworth*, 382 F.3d 529 (5th Cir. 2004) (The Fourteenth Amendment prohibits the imposition of punitive conditions of confinement on detainees.)

Here, plaintiff complains, not of general conditions of confinement – such as the number

11

of bunks in a cell – but rather of specific "episodic acts or omissions" – including the denial of appropriate medical care.  Compare *Edwards v. Johnson*, 209 F.3d 772 (5th Cir. 2000). A detainee's rights under such circumstances are violated only if the defendants acted  with deliberate indifference to a substantial risk of serious harm which resulted in injury. *Wagner v. Bay City,* 227 F.3d at 324 (citing *Hare v. City of Corinth*, 74 F.3d 633, 639 (5th Cir.1996) *(en banc)*; see also *Edwards v. Johnson*, 209 F.3d 772 (5th Cir. 2000) ("To prove an underlying constitutional violation in an episodic acts case, the detainee must establish that the official acted with subjective deliberate indifference.")*.* Deliberate indifference requires that the defendants have subjective knowledge of the risk of harm. *Id.* Mere negligence or a failure to act reasonably is not enough. The defendants  must have the subjective intent to cause harm. *Id.*

Deliberate indifference in this context means that: (1) the prison officials were aware of facts from which an inference of substantial risk of serious harm could be drawn; (2) the officials actually drew that inference; and (3) the officials' response indicated that they subjectively intended that harm occur. *Thompson v. Upshur County, Texas*, 245 F.3d at 458-59.  Thus, "... the failure to alleviate a significant risk that [the official] should have perceived, but did not is insufficient to show deliberate indifference." *Domino v. Texas Department of Criminal Justice*, 239 F.3d 752, 756 (5th Cir.2001)(emphasis supplied). Moreover, "deliberate indifference cannot be inferred merely from a negligent or even a grossly negligent response to a substantial risk of serious harm." *Thompson*, 245 F.3d at 459 (emphasis supplied). "Deliberate indifference encompasses only unnecessary and wanton infliction of pain repugnant to the conscience of mankind." *McCormick v. Stalder*, 105 F.3d 1059, 1061 (5th Cir.1997); see also *Stewart v. Murphy*, 174 F.3d 530, 534 (5th Cir.1999).

Plaintiff has consistently and only alleged fault with regard to the defendants as follows:

12

(1) physicians and staff at the LSU Medical Center failed to properly diagnose his condition; and

(2) physicians and staff and LSU and at OCC failed to provide him appropriate pain management

treatment.[9]

By his own admission, in each pleading submitted to the Court, plaintiff received

immediate medical attention once prison officials were made aware of his accident.  He  was

taken to a nearby hospital where he was examined by physicians who determined that he had

suffered from nothing more serious than contusions. The treatment recommended for plaintiff's

condition was appropriate under the circumstances.

Plaintiff's x-rays were examined approximately one month following his accident and it

was apparently determined that the original diagnosis was incorrect. Nevertheless, there appears

to have been no change in the treatment protocol authorized by the physicians at the LSU

Medical Center.[10]  Plaintiff, by his own admission, was provided with prescribed pain relieving

drugs, including ultram, and was directed to supplement these drugs with over the counter

medications for pain.  Indeed, by his own admission, plaintiff has been in the "free world" for

over two months now – under the care of his mother and health care providers of his own

_____

[9] Plaintiff has never suggested that he was denied any specific therapeutic treatment for his "broken neck."
He has always and only complained that he was denied appropriate pain medication. In his amended complaint,
plaintiff, for the first time, and without elaboration, attributed his present condition and disability to the failure to
properly treat his injury and he has surmised that his neck may have to be broken again and then reset in order to
alleviate the pain.  [Doc. 20, p. 24, ¶15] Nevertheless, as is shown hereinafter, plaintiff has never alleged or
described any orthopedic therapy that should have been ordered but was not.

[10] As noted previously, plaintiff was ordered to provide, among other things, "The treatment ordered by  ...
any other physician..." for plaintiff's condition, i.e., a  "broken neck"; "... whether the physician or health care
professional ordered any particular or specific  form of therapy or treatment;" and, "... whether or not he has been
denied the treatment or medication, who was responsible for denying the treatment or medication, and the dates that
he was denied the treatment or medication and the reason given, if any, to justify the denial of the specific treatment
or medication." [Doc. 12 (Emphasis in original)]

choosing – nevertheless he still complains of pain.[11]

Plaintiff has throughout these proceedings merely disagreed with the diagnosis and treatment protocol recommended by his treating physicians and such disagreement, is insufficient to state a claim for deliberate indifference. See *Varnado v. Lynaugh*, 920 F.2d 320, 321 (5th Cir.1991); *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir.1985); *Norton v. Dimazana*, 122 F.3d 286, 292 (5th Cir.1997).  Despite having been afforded multiple opportunities to do so, plaintiff has not shown that the defendants "'refused to treat [him], ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.'" *Domino v. Tex. Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir.2001) (citing *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir.1985)).

In short, plaintiff's medical care claim is  frivolous and dismissal on that basis is again recommended.

### 3. Appointment of Counsel and Other Motions  [Docs. 17 and  23]

Plaintiff has also requested the appointment of counsel. Congress has not specifically authorized courts to appoint counsel for plaintiffs proceeding under 42 U.S.C. §1983.  "Generally no right to counsel exists in §1983 actions [but] appointment of counsel should be made as authorized by 28 U.S.C. §1915 where 'exceptional circumstances' are present." *Robbins v. Maggio*, 750 F.2d. 405 (5th Cir. 1985).  Pursuant to 28 U.S.C. §1915(e)(1), federal courts are given the power to request that an attorney represent an indigent plaintiff. In the case of *Mallard v. United States District Court for the Southern District*,  490 U.S. 296, 301-302, 109 S.Ct. 1814,

---

[11] See Doc. 20,  ¶W –  Plaintiff is now being cared for by his mother and treated by "medical physicians outside of prison ... seeking relief from pain and suffering..."  <u>According to plaintiff, notwithstanding the care he is now receiving, he "... is still in great pain ... and still remains in great pain as of ... October 13, 2009..."</u> [Doc. 20, p. 24, ¶13]

1818, 104 L.Ed.2d 318 (1989) the United States Supreme Court held that federal courts can only request that an attorney represent a person unable to employ counsel because federal courts are not empowered under 28 U.S.C. §1915(e)(1) to make compulsory appointments.

Although courts can request that an attorney represent an indigent plaintiff, the court is not required to make this request in the absence of "exceptional circumstances." See *Ulmer v. Chancellor*, 691 F.2d. 209, 212 (5th Cir. 1982) and *Jackson v. Cain*, 864 F.2d. 1235, 1242 (5th Cir. 1989). No precise definition of "exceptional circumstances" is available, but the United States Courts of Appeal have provided a litany of factors for lower courts to consider in determining whether the plaintiff is entitled to have the court request that counsel assist him in his suit. It is proper for the court to consider the following factors: the type and complexity of the case; the plaintiff's ability to adequately present and investigate his case; the presence of evidence which largely consists of conflicting testimony so as to require skill in presentation of evidence and cross-examination; and the likelihood that appointment will benefit the petitioner, the court, and the defendants by "shortening the trial and assisting in just determination." See *Parker v. Carpenter*, 978 F.2d. 190 (5th Cir. 1992), citing *Murphy v. Kellar*, 950 F.2d. at 293, n.14; *see also Ulmer*, 691 F.2d. at 213, and *Jackson*, 864 F.2d. at 1242. Additionally, a court may consider whether a plaintiff has demonstrated the inability to secure private counsel on his own behalf. *See Jackson*, 864 F.2d. at 1242; *Ulmer*, 691 F.2d. at 213. Plaintiff is not excused from trying to procure counsel for himself.

Plaintiff has managed to file his original complaint setting forth his cause of action against the named defendants. He filed an objection and an amended complaint. No special legal knowledge is required of plaintiff herein; he has been instructed on the applicable law and directed to provide the **FACTUAL** basis for his complaint. Indeed, plaintiff, and no one else,

15

has first hand knowledge of the **FACTS** which form the basis of this action. The claim is not necessarily atypical of those often asserted in civil rights litigation and is not complex.

Finally, plaintiff has failed to demonstrate that he has attempted to procure counsel on his behalf. Accordingly, plaintiff's request for appointment of counsel should be denied as the circumstances presented herein are not "exceptional" so as to  warrant the appointment of counsel.  Moreover, plaintiff's request should be denied because plaintiff has failed to demonstrate any effort to secure counsel on his own behalf.

Plaintiff has also requested the suspension of costs and an order directing the defendants to provide him with copies of his medical records. Plaintiff has not shown that he is entitled to such relief.

### 4. Conclusion and Recommendation

Therefore,

Plaintiff's request for appointment of counsel, for suspension of costs, and for an order directing the defendants to provide medical records [Docs. 17 and 23] are **DENIED,** and,

**IT IS RECOMMENDED** that plaintiff's medical care claim be **DISMISSED WITH PREJUDICE** as frivolous in accordance with the provisions of 28 U.S.C. § 1915(e)(2)(B).

Under the provisions of 28 U.S.C. §636(b)(1)(C) and Fed.R.Civ.Proc. 72(b), parties aggrieved by this recommendation have ten (10) business days from service of this report and recommendation to file specific, written objections with the clerk of court. A party may respond to another party's objections within ten (10) days after being served with a copy thereof.

**Failure to file written objections to the proposed factual finding and/or the proposed legal conclusions reflected in this Report and Recommendation within ten (10) days following the date of its service, or within the time frame authorized by Fed.R.Civ.P. 6(b),**

shall bar an aggrieved party from attacking either the factual findings or the legal

conclusions accepted by the District Court, except upon grounds of plain error. See

*Douglass v. United Services Automobile Association,* **79 F.3d 1415 (5th Cir. 1996).**

    In Chambers, Monroe, Louisiana, December 2, 2009.

KAREN L. HAYES
U. S. MAGISTRATE JUDGE

17